UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

**CRIMINAL ACTION NO. 11-33-DLB-JGW**

**UNITED STATES OF AMERICA**                                                    **PLAINTIFF**

**VS.**                 **MEMORANDUM ORDER & OPINION**

**KEVIN McCORMICK**                                                **DEFENDANT**

\* \* \* \* \* \* \* \* \* \* \* \*

This matter is currently before the Court upon Defendant's Motion to Suppress four firearms seized by law enforcement officers following a search of Defendant's residence. (Doc. # 21).[1] The government has filed its response to the motion. (Doc. # 23). An evidentiary hearing was conducted on October 20, 2011. Defendant was present for the hearing and was represented by Attorney Kerry Neff. Plaintiff was represented by Assistant U.S. Attorney Elaine Leonhard. At the conclusion of the hearing, the motion was submitted for decision. For the reasons set forth herein, Defendant's motion to suppress is hereby **DENIED**.

**I. Issues raised**

In his motion, Defendant seeks to suppress four firearms seized by law enforcement officers from his residence. In support, Defendant argues that the search of his home and

---

[1] In Defendant's motion, he seeks to suppress evidence seized from his residence and any incriminating statements obtained in violation of his Fourth, Fifth, Sixth and Fourteenth Amendment rights. At the evidentiary hearing, Defendant's counsel clarified that Defendant was seeking to suppress evidence based on the warrantless entry into Defendant's residence.

1

seizure of the firearms was unreasonable in violation of his rights secured by the Fourth and Fourteenth Amendments of the U.S. Constitution because they were conducted without a warrant and because no exception to the warrant requirement applies.

## II. Findings of Fact

During the October 20, 2011 evidentiary hearing, several witnesses testified. The United States called Trooper Jeremy Moore of the Kentucky State Police, and Deputy Chris Baker of the Bracken County Sheriff's department. Defendant called Sergeant Chris Steward of the Kentucky State Police, and Defendant testified on his own behalf. Weighing the credibility of the witnesses, and considering the exhibits admitted during the hearing, the Court makes the following factual findings:

1. On October 1, 2010, at approximately 11:00 p.m., Bracken County Sheriff's Deputy Chris Baker ("Deputy Baker") was dispatched to the residence of Angela Smith based on a report of domestic violence. Ms. Smith was Defendant Kevin McCormick's girlfriend at the time.

2. Upon arriving at Ms. Smith's residence, Ms. Smith reported to Deputy Baker that she had been hit and thrown to the ground by Defendant earlier that evening. Ms. Smith also communicated that Defendant was a convicted felon, he had been drinking that evening, was currently at his residence, and possessed firearms in his residence.

3. After receiving Ms. Smith's report, Deputy Baker requested backup from Kentucky State Police to accompany him at Defendant's residence, investigate the complaint and possibly effectuate an arrest.

4. Kentucky State Police Sergeant Chris Steward ("Sergeant Steward") and Trooper Jeremy Moore ("Trooper Moore") accompanied Deputy Baker to Defendant's

residence.

5. Upon arriving at Defendant's residence, a single-wide trailer, located in rural Bracken County Kentucky, Officer Baker repeatedly knocked on Defendant's front door, but no one responded.

6. The officers then proceeded around Defendant's residence, looking in windows to see if anyone was home. Through Defendant's bedroom window, Deputy Baker observed Defendant sleeping on his bed. Deputy Baker then knocked on the window to wake Defendant.

7. Defendant awoke and opened his bedroom window. Through the window, Deputy Baker attempted to question Defendant and also requested that he come outside, but Defendant only responded with expletives about being awoken at such a late hour.

8. Deputy Baker eventually convinced Defendant to come outside and talk with the officers on his front porch. Once on the front porch, Defendant appeared intoxicated, but was able to stand unassisted, did not stumble or stagger, and his speech was clear and coherent.

9. After talking with the officers on the front porch, Defendant asked if he could return inside. Deputy Baker demanded that he stay on the front porch and talk with the officers. As all three officers testified, Defendant responded by inviting them into his residence so that they could continue to talk.[2] Defendant then turned around and walked

---

[2] Defendant testified that he never invited the officers into his residence. Instead, Defendant testified that he walked out on the front porch and immediately began exchanging words with Deputy Baker. Finding that his argument with Deputy Baker was going nowhere, Defendant then walked down the stairs of his front porch towards Sergeant Steward. Once on the sidewalk, Sergeant Steward deployed his Taser against Defendant. Defendant was handcuffed, the Taser prongs were removed from his chest, and he was placed in the back seat of a police vehicle. According to Defendant, he never reentered his residence that night. However, the Court finds that Defendant's testimony is not credible for reasons set forth herein.

inside.

10. Pursuant to Defendant's invitation, all three officers followed Defendant through the front door of Defendant's single-wide trailer and into the living room area. Once inside, Defendant never asked the officers to leave or expressed any displeasure with the officers' presence inside his residence.

11. While the officers testified somewhat inconsistently about the amount of lighting in Defendant's residence, all three confirmed that the residence was lit by at least "ambient" lighting. Likewise, all three stated that the lighting was sufficient to see inside the small, narrow single-wide trailer. None of the officers testified that they used flashlights once inside the residence, which supports their testimony that the lighting inside the residence was sufficient for them to observe their surroundings. The Court further finds it highly unlikely that they would enter a suspect's residence and not have sufficient lighting to see.

12. Once inside the residence, Defendant continued through the living room area, into the kitchen, and began walking down the hallway. Sergeant Steward commanded that Defendant stop, fearing that Defendant may try to access the firearms reportedly stored at his residence. However, Defendant ignored Sergeant Steward's requests. Sergeant Steward then grabbed Defendant in an attempt to stop his progress, but Defendant quickly turned and assumed a fighting posture against Sergeant Steward.

13. In order to gain compliance, Sergeant Steward deployed his Taser twice against Defendant. Defendant fell to the kitchen floor, landing between the refrigerator and kitchen table, with his head near the backdoor and hallway.

14. All three officers rushed to Defendant to subdue him and place him in handcuffs. During this process, Trooper Moore was positioned at Defendant's head between the backdoor and kitchen table such that he was facing down the hallway. As Sergeant Steward and Deputy Baker placed Defendant in handcuffs and lifted him to his feet, Trooper Moore saw a gun at the end of the hallway leaning in a corner, approximately seven to eight feet away.

15. As the other two officers removed Defendant from the residence, Trooper Moore walked down the hallway to investigate the gun he spotted from his position in the kitchen. Upon investigation, Trooper Moore discovered that what he believed to be a rifle was actually a BB gun.

16. Trooper Moore then turned to walk back down the hallway. As he turned to his left, he saw the stocks of three rifles sticking out from under the bed in Defendant's bedroom.

17. Trooper Moore walked over to the bed and pulled out the three firearms. In doing so, Trooper Moore spotted a fourth firearm also under Defendant's bed. All four firearms were seized from Defendant's residence.

18. Meanwhile, Deputy Baker and Sergeant Steward removed Defendant from his residence. Once outside, the officers removed the Taser prongs from Defendant's chest, bandaged Defendant's wounds and placed him in the back of a police vehicle. Neither Deputy Baker or Sergeant Steward saw the four firearms while they were inside the residence.

### III. Analysis

The Court must decide two issues in resolving Defendant's motion to suppress. First, whether the officers had consent to enter Defendant's residence without a warrant. If so, the second question is whether the firearms were seized in plain view. Each issue will be addressed in turn.

#### A. Consent

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . .'" *United States v. McClain*, 444 F.3d 556, 561 (6th Cir. 2006) (quoting U.S. CONST. amend. IV). "The chief evil that the Fourth Amendment protects against is the physical entry of the home. Searches of the home must be reasonable." *Johnson v. City of Memphis*, 617 F.3d 864, 867 (6th Cir. 2010) (internal citations and quotations omitted). "The reasonableness requirement generally requires that police obtain a warrant based upon a judicial determination of probable cause prior to entering a home." *Thacker v. City of Columbus*, 328 F.3d 244, 252 (6th Cir. 2003). A search conducted without a warrant issued upon probable cause is "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967).

One well-delineated exception is a search that is conducted pursuant to consent. *Id.* at 358 & n.22. If the government "seeks to rely upon consent to justify the lawfulness of a search, [it] has the burden of proving that the consent was, in fact, freely and voluntarily given." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). The government can meet this burden only by providing "clear and positive testimony" demonstrating voluntary consent by a

preponderance of the evidence. *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009).

"[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. In making its determination, the court must consider all subtly coercive police behavior and any possible vulnerable state of the person granting consent. *Id.* at 229. The court should also "examine the characteristics of the accused, including the age, intelligence, and education of the individual." *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998) (citing *United States v. Jones*, 846 F.2d 358, 360 (6th Cir. 1988)).

Moreover, courts are not to apply a per se rule that intoxication necessarily defeats an individual's capacity to consent. *United States v. Montgomery*, 621 F.3d 568, 572 (6th Cir. 2010). Instead, an individual's intoxication is to be considered as part of the "totality of all the circumstances" surrounding the consent. *Id.* Intoxication is a matter of degree and should be considered on a case-by-case basis. *Id.* The Sixth Circuit has routinely found that an intoxicated individual had the requisite capacity to give valid consent. *Id.* For example, in *United States v. Griffin*, No. 96-5326, 1997 WL 487325 at *3, (6th Cir. Aug. 15, 1997)(per curiam), the Court held that "voluntary consent can be given by a person under the influence of drugs, when the person is coherent and fails to exhibit any visible impairments." In another case, the Sixth Circuit upheld the district court's determination that the defendant gave valid consent because two police officers testified that "even though they smelled alcohol on [the defendant's] breath, [the defendant] did not seem impaired, was not swaying or unsteady, had no trouble signing the consent form, and

7

appeared to be coherent." *United States v. Fletcher*, 295 F. App'x 749, 757 (6th Cir. 2008).

In this case, although the officers entered Defendant's residence without a warrant, their entry did not violate Defendant's Fourth Amendment rights because Defendant gave free and voluntary consent. *See Katz*, 389 U.S. at 358. As all three officers consistently testified, Defendant exited his residence, briefly argued with the officers, and then expressly invited the officers into his trailer to continue their discussion, telling them, "let's go in and talk about it." Defendant then turned around, went back inside, and the officers followed. Once inside, Defendant never withdrew his consent by asking the officers to leave.[3] Therefore, the "clear and positive" testimony offered by the United States shows, by a preponderance of the evidence, that Defendant consented to the officers' entry into his residence. *See Canipe*, 569 F.3d at 602.

Defendant's argument that the consent exception to the warrant requirement does not apply is without merit. Defendant testified that he never invited the officers into his residence. Instead, Defendant claims that he emerged from his residence onto his front porch, argued with one officer and then walked down the porch stairs to the sidewalk, where he was immediately tased by Sergeant Steward. Defendant believes he was tased for no reason, "unless it was because [his] attitude or because of, you know, cussing [the officers]." Defendant's testimony is not credible as it entirely contradicts the testimony of three experienced police officers. Not a single piece of evidence corroborates Defendant's testimony about his arrest. Furthermore, it is not believable that Sergeant Steward, a

---

[3] Trooper Moore testified that to the best of his recollection he did not recall Defendant ever telling the officers to leave his residence. Defendant did, however, tell Sergeant Steward to "get off of [him]" when Sergeant Steward attempted to prevent Defendant from continuing to the back of the residence.

twelve-year veteran of the Kentucky State Police, would deploy his Taser against an individual for no reason or merely because the individual "cussed" at police officers. Defendant's further argument that the officers initially entered his residence after he was handcuffed and placed in the police cruiser is equally unbelievable. Therefore, the Court specifically rejects Defendant's version of the events that ensued after he exited his residence.

Having found that Defendant gave officers consent to enter his residence by telling them to "let's go in and talk about it," the totality of the circumstances also indicates that Defendant's consent was free and voluntary. Although Defendant was described by Trooper Moore as "highly intoxicated," Trooper Moore testified, and the other officers verified, that his intoxication did not impair his ability to walk, speak, or respond to questions. Throughout the officers' interactions with Defendant, Defendant had moments of rage and then moments where he was "coherent, calm, collected." Despite his volatile state, Defendant was able to coherently converse with the officers, particularly when he was on the front porch and denied domestic violence allegations made by his girlfriend, Ms. Smith. Most importantly, Defendant was described as calm and coherent when he invited the officers inside his residence. Combined, these facts indicate that while Defendant may have been intoxicated, he was not so intoxicated that he lacked the ability to offer voluntary consent. *See Fletcher*, 295 F. App'x at 757. In short, Defendant demonstrated that he understood the purpose of the officers' presence and willingly invited them inside his residence.

Additionally, the actions of the officers were not coercive and did not place Defendant under duress such that his consent was involuntary. Two points during the

9

Defendant's interaction with the officers merit specific consideration. First, although the officers startled and infuriated Defendant when they woke him by knocking on his bedroom window, Defendant had regained his composure before inviting the officers inside his residence. Therefore, the officers unexpected presence did not ultimately affect Defendant's consent. Second, the officers' demands that Defendant remain outside with them were not intended to coerce Defendant into giving the officers consent to enter the residence. As Deputy Baker testified, the officers wanted to keep Defendant outside so that he could not access the weapons that the officers believed were stored inside his residence. Therefore, neither of these instances, nor any other actions of the officers, coerced Defendant into giving the officers consent to enter his residence. Instead, based on the totality of the circumstances, Defendant's consent was free and voluntary.

### B. Plain View

Having found that the officers lawfully entered Defendant's residence pursuant to Defendant's consent, the Court now turns to the issue of whether the officers lawfully seized firearms from Defendant's residence.[4] "It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Horton v. California*, 496 U.S. 128, 134 (1990) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971)). To do so, four factors must be satisfied: "(1) the object must be in plain view; (2) the officer must be legally present in the place from which the object can be plainly

---

[4] While Defendant granted consent for the officers to enter his residence, he did not give the officers consent to search his home. Thus, the officers were initially entitled only to enter the residence and could not move about the residence to effectuate a general search. *See United States v. Yoon*, 398 F.3d 802, 806 n.1 (6th Cir. 2005) (discussing the doctrine of "consent once removed"). However, "[t]he officers [were entitled] of course [to] seize anything in plain view . . . , but they [could] not conduct a general search without first satisfying the ordinary requirements of consent, a warrant, or exigent circumstances which excuse the failure to obtain a warrant." *Id.* (internal citations and quotations omitted).

seen; (3) the object's incriminating nature must be immediately apparent; and (4) the officer must have a right of access to the object." *United States. v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007) (citing *Horton*, 496 U.S. at 136-37; *United States v. McLevain*, 310 F.3d 434, 438-39 (6th Cir. 2002)).

The Sixth Circuit examines three factors, "none of which is necessary but each of which is instructive," to determine whether an object's incriminating character is "immediately apparent." *Garcia*, 496 F.3d at 510. First, whether there is "a nexus between the seized object and the items particularized in the search warrant." *United States v. Beal*, 810 F.2d 574, 576-77 (6th Cir. 1987). Second, "whether the intrinsic nature or appearance of the seized object gives probable cause to believe that it is associated with criminal activity." *Id.* Third, whether "the executing officers can at the time of discovery of the objects on the facts then available to them determine probable cause of the object's incriminating nature." *Id.* "If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object – i.e. if its incriminating character is not immediately apparent – the plain-view doctrine cannot justify its seizure." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (internal citations and quotations omitted).

In determining whether Trooper Moore improperly seized firearms from Defendant's residence, each of the Trooper's movements should be considered in isolation. As was discussed above, Trooper Moore and the other officers had consent to enter Defendant's residence. Once inside, Defendant was commanded to not continue walking through the house, but Defendant ignored the commands. After showing aggression towards the officers, Sergeant Steward deployed his Taser against Defendant, causing Defendant to

fall to the ground between the kitchen and the hallway. Trooper Moore rushed to Defendant, still lying on the ground, in order to subdue him and place him in handcuffs. At that time, Trooper Moore was lawfully present in the area between the kitchen and the hallway.

From Trooper Moore's vantage point in proximity to Defendant, Trooper Moore noticed a "black firearm, a rifle" propped in a corner at the end of the hallway, approximately seven to eight feet away. Although the lighting was dim, it was sufficient for Trooper Moore to see down the hallway in the narrow, single-wide trailer. Additionally, Trooper Moore immediately had probable cause to believe the firearm was contraband because he was aware that Defendant was a convicted felon and, thus, prohibited from possessing a firearm. As the other officers lifted Defendant off the ground, Trooper Moore walked toward the firearm to secure and investigate it. At that time, Trooper Moore was lawfully present at the end of the hallway.

Upon investigating the firearm, Trooper Moore realized it was actually a BB gun. He then turned to his left and looked through the open door of Defendant's bedroom. Two feet away and in plain view, Trooper Moore saw "three butts of rifles sticking out on the wall below the headboard of the bed." Again, Trooper Moore immediately recognized the firearms to be contraband because he knew that Defendant was a convicted felon. As Trooper Moore pulled the three firearms out from under the bed, he discovered a fourth firearm also under the bed, in plain view. The four firearms were ultimately seized from Defendant's residence.

All four factors of the plain view analysis are satisfied here. *See Horton*, 496 U.S. at 136-37. First, each of the firearms were in plain view. Three of the firearms were

protruding from beneath defendant's bed, which Trooper Moore observed by looking through the open doorway into Defendant's bedroom. The fourth firearm was plainly visible once Trooper Moore investigated the first three firearms. Second, Trooper Moore was legally present in the place from which the firearms were seen. He entered the house based on Defendant's valid consent. He then observed the firearms from his position in the hallway, where he was lawfully present because he was investigating what he believed to be a rifle that he observed from the kitchen. Third, the firearms' incriminating nature was immediately apparent because Trooper Moore knew that Defendant was a convicted felon who was prohibited from possessing firearms. Fourth, Trooper Moore had a right to access the firearms because he was lawfully present in the residence based on Defendant's consent. *See Boone v. Spurgess*, 385 F.3d 923, 928 (6th Cir. 2004) (noting that "lawful right of access" refers to where the officer must be to retrieve the item, while "lawfully positioned," the second factor, refers to where the officer stands when he or she sees the item).

### IV.     Conclusion

Accordingly, for all of these reasons, **IT IS ORDERED** that Defendant's Motion to Suppress (Doc. # 21) evidence seized from his house on or about October 1, 2010 is **DENIED.** The time period between September 30, 2011 and the date of this Order, totaling thirty-two (32) days, is excluded from the provisions of the Speedy Trial Act pursuant to 18 U.S.C. § 3161(h)(1)(D).

This 1st day of November, 2011.



Signed By:
*David L. Bunning*   *DB*
United States District Judge

G:\DATA\ORDERS\Covington Criminal\2011\11-33-DLB MOO denying mtn to suppress.wpd